UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PEGGY WILSON,

    *Plaintiff*,

v.

CHAD F. WOLF, Acting Secretary of
Homeland Security,

    *Defendant*.

Civil Action No. 1:18-cv-00322 (CJN)

## MEMORANDUM OPINION

Plaintiff Peggy Wilson is a Deputy Financial Manager in the Customs and Border Protection component (CBP) of the Department of Homeland Security (DHS). Pl.'s Counter-Statement of Disputed Facts ("Def.'s SoF") ¶ 1, ECF No. 17-1. After she was passed over for promotion, Wilson filed this suit, alleging discrimination on the bases of race, national origin, sex, and age. Compl. ¶¶ 106–26, ECF No. 1. Both Parties have moved for summary judgment. *See generally* Pl.'s Mot. for Summ. J., ECF No. 13; Def.'s Cross-Mot. for Summ. J., ECF No. 15. For the reasons stated below, the Court grants Defendant's Motion.

### I.    Background

Wilson is a fifty-six-year-old, African American female who is currently employed by CBP as a Deputy Financial Manager, a GS-14 position that she had held since 2012. Def.'s SoF ¶ 1; Def.'s Counter-Statement of Disputed Facts ("Pl.'s SoF") ¶ 1, ECF No. 15-5;[1] Wilson

---

[1] Under Local Civil Rule 7(h) and Federal Rule of Civil Procedure 56(c), the Court "assume[s] that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

Résumé at 1, ECF No. 16-3 at 5. Wilson's résumé states that, in her current role, she "[s]erve[s] as a key member of the Financial Management Branch . . . within the Cargo Systems Program (CSPO) [at CBP] with responsibility for assisting the Branch Chief, with overall management of CSPO financial activities." Wilson Résumé at 1. Prior to that position, Wilson was a Financial Management Analyst at DHS, another GS-14 position. *Id* at 2. In that position,

> [she] managed a 1.2 billion dollar program, which consists of approximately 230,000 charge cards. [She] directly supervised 3 DHS Agency Program Coordinators and indirectly supervised 66 Organizational Program Coordinators to ensure internal controls and compliance with DHS policies were adhered to. [She] led and implemented changes in DHS's four bankcard (debit, travel, fleet, and purchase) programs which included (1) developing and implementing policy; (2) establishing and deploying internal controls; and (3) conducting and certifying program audits.

*Id.* at 2. Wilson studied for one year at Knoxville College, and she has twenty-five accounting credits from Prince George's Community College. Wilson Depo. at 11, ECF No. 15-2; Wilson Résumé at 6.

In July 2014, DHS's Office of the Chief Financial Officer posted a job announcement for a full-time Supervisory Financial Management Specialist, a GS-15 position (the "GS-15 position"). Def.'s SoF ¶ 3. The job announcement stated that "[t]he primary purpose of this position is to serve as a financial management technical expert, utilizing a professional knowledge of financial management and/or internal control principles and procedures to advise internal and external stakeholders and customers on best practices, policies and procedures and systems requirements." Job Announcement at 1, ECF No. 16-3 at 12.

The announcement went on to enumerate the following responsibilities and duties for the position:

- Provides oversight in formulating strategic financial plans and prepares financial analyses; assess products or procedures for compliance with government standards,

2

> accounting principles, internal controls, and multitiered system application standards.
>
> - Provides guidance to staff deployed within DHS component bureaus to support and manage government charge card programs.
>
> - Analyze new or proposed legislative actions, executive guidance, policy, requirements and initiatives and assess impact on program policies, processes, goals, and objectives; analyze technical plans, fiscal history, and fiscal performance to ensure efficient utilizations of resources and to ensure consistency with established policy and management objectives: identifies problem areas and recommends changes for corrective action.
>
> - Coordinate the Department's response to external audits of its government charge card programs, including gathering, reviewing, and synthesizing input from DHS components.

*Id.* at 2.

And in its "Qualifications Required" section, the posting stated:

> Specialized Experience:
>
> To qualify for the GS-15 [position], you must possess one year of specialized experience equivalent to the GS-14 level in the Federal service, or comparable experience not gained through federal service. For this position, specialized experience is defined as serving as a financial management technical expert, utilizing a professional knowledge of financial management and/or internal control principles and procedures to advise internal and external stakeholders and customers on best practices, policies and procedures and systems requirements. Such experience may include:
>
> - Overseeing all of the Department's government charge card programs, most significantly the purchase card, travel card, and fleet fuel card programs.
>
> - Supervises a headquarters oversight staff and provides guidance to staff in the DHS component organizations that are responsible for execution of these programs.
>
> Substitution of education in lieu of specialized experience may not be used for this grade level.

*Id.* at 2.

The job announcement attracted a total of sixty-eight candidates, including Wilson. Def.'s SoF ¶ 4. Forty-seven candidates were certified for the position by the DHS Office of the Chief Human Capital Officer, following the U.S. Office of Personnel Management (OPM) and DHS promotion selection procedure. Pl.'s SoF ¶ 18. The Office of the Chief Human Capital Officer forwarded the certified candidates, including Wilson, to a promotion panel set up to evaluate and select candidates for interviews. Def.'s SoF ¶ 4; Pl.'s SoF ¶ 18.

Three employees from the Office of the Chief Financial Officer served on the promotion panel: (1) Jeffrey Bobich, Director of the Financial Management Division; (2) Melissa Morgan-Lowden, Deputy Director, Financial Management Division; and (3) Christine Burris, Assistant Director, Financial Coordination Branch. Pl.'s SoF ¶ 21. Bobich is a white male, Morgan-Lowden is a white female, and Burris is an African American and Asian female. *See id.* ¶ 22.

The promotion panel deemed thirty-eight candidates qualified for the position, including Wilson. Def's SoF ¶ 4. Only six candidates, however, were selected for interviews, and Wilson was not one of these six. *Id.* ¶ 5.

Five candidates agreed to interview, and from September 8 to 12, 2014, all three members of the promotion panel interviewed the remaining five candidates. Memorandum from Jeffrey M. Bobich, Dir. Fin. Mgmt., to Chip Fulghum, Performing the Functions of the Chief Fin. Officer ("Bobich Memo") at 1 (Sept. 18, 2014), ECF No. 14-8 at 11; *see* Def.'s SoF ¶ 6. The panel asked each candidate the same fourteen questions, which were drafted by Bobich and Morgan-Lewis. *Id.* ¶ 7; Pl.'s SoF ¶¶ 33–34. Three candidates were selected for second-round interviews. Def.'s SoF ¶ 7.

On September 16, 2014, Bobich and Morgan-Lowden conducted the second-round interviews without Burris. *Id.* ¶ 8; Pl.'s SoF ¶ 41. They interviewed two of the three remaining candidates: Robert Taylor, a white male, and Rothley Howard, an African American male. *See* Pl.'s SoF ¶ 41. The panel referred the third candidate, Susie Dossie, a white female, for a position in the Office of Risk Management and Assurance based on her qualifications. *See* Bobich Memo at 1; Complainant's Answers to Agency's Interrogs. at 6, ECF 16-3 at 56. Dossie was hired by that office. *See* Bobich Memo at 1; Complainant's Answers to Agency's Interrogs. at 6.

Bobich and Morgan-Lowden ultimately selected Taylor for the GS-15 position at issue here. Bobich Memo at 1. In a memorandum to his superior, Bobich noted that

> [i]n interviewing candidates and making a selection, the . . . panel focused on three primary qualifications: (1) Ability to lead projects and people, (2) technical subject matter expertise, and (3) ability to lead change from a department-wide perspective, working with external customers and stakeholders outside the immediate span of control. During our interview process, Mr. Taylor demonstrated all these qualifications, and did so in a more convincing manner than the other interviewees.

*Id.* at 1–2. Prior to applying to the GS-15 position, Taylor held a position at the Office of the Chief Financial Officer Financial Policy Branch. Bobich EEO Decl. at 4, ECF No. 14-8 at 3. According to Bobich, during Taylor's time in that position he

> demonstrated the ability to lead complex financial policy initiatives, including implementation of internal controls over conference approval and leadership of multiple investigations of potential Anti-Deficiency Act violations. He also led a team that developed the DHS-wide methodology for allocating costs by DHS mission area on the Department's annual State of Net Cost (which is subject to annual audit).

*Id.* Taylor "holds Bachelor's and Master's degrees from West Virginia University" and is a Certified Fraud Examiner. *Id.*

Taylor's appointment became effective on October 6, 2014, Pl.'s SoF ¶ 44, and was announced by Bobich to the wider DHS financial management group on October 7, 2014. Email from Jeffrey Bobich, Dir. Fin. Mgmt., to Fin. Mgmt. Working Grp. (Oct. 7, 2014), ECF No. 14-8 at 2.

On October 31, 2014, Wilson filed a complaint with the DHS Equal Employment Opportunity (EEO) Office. Compl. ¶ 7; Answer ¶ 7, ECF No. 8. On November 29, 2017, the DHS EEO Office issue a final decision granting summary judgment to DHS. Compl. ¶ 7; Answer ¶ 7.

Wilson filed her Complaint in this Court on February 12, 2018, alleging discrimination through disparate treatment based on her race, sex, and age.[2] *See generally* Compl. Both Parties have moved for summary judgment.

## II. Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). After the moving party has met its burden, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)

---

[2] Wilson originally brought suit against then-Secretary Kirstjen Nielsen; the Court substitutes the current Acting Secretary Chad F. Wolf under Federal Rule of Civil Procedure 25(d).

(citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252. In other words, "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Id.*

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). But if "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of . . . summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"While summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [her] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortg. Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998)). "Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008). And "'conclusory allegations[,]' . . . whether in the form of a plaintiff's own testimony or other evidence submitted by a plaintiff to oppose a summary judgment motion, 'do not create genuine issues of material fact.'" *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) (citation omitted).

### III.  Analysis

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e-17 (2018), prohibits federal agencies from discriminating in employment on the basis of race and sex. *Id.*

§ 2000e-16(a). Although Title VII's language differs for the federal government and private employers, the D.C. Circuit has held that those provisions "contain identical prohibitions." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (citing *Singletary v. District of Columbia*, 351 F.3d 519, 523–24 (D.C. Cir. 2003)).

Absent evidence of direct discrimination, in Title VII disparate-treatment cases, courts generally apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination. *Czekalski*, 475 F.3d at 363. The prima facie case requires the plaintiff to show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Id.* at 364 (citation omitted). Once the plaintiff has made that showing, the burden shifts to the employer, which must "'articulate some legitimate, non-discriminatory reason' for the adverse action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer makes that showing, the burden shifts back to the plaintiff, who must demonstrate that the employer's "stated reason for its actions was in fact pretext for unlawful discrimination." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) (citation omitted).

At the summary judgment stage, when "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the Court should focus only on the third part of the *McDonnell Douglas* analysis. *See id.* But *Brady* does not "relieve the employer of its burden . . . 'to articulate a legitimate, nondiscriminatory reason for its action.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir.

2019) (quoting *Wheeler*, 812 F.3d at 1114). If it has done so, to "survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998)).

Here, the government asserts a legitimate, non-discriminatory reason for not selecting Wilson for the GS-15 position—namely, that DHS selected Taylor because he was the most qualified for the job. Mem. of P. & A. in Supp. of Def.'s Cross-Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mot. & Opp'n") at 8–9, ECF No. 15-1. Wilson does not argue that the government's proffered reason fails to satisfy its second-step burden. Pl.'s Mot. at 4; *see also Figueroa*, 923 F.3d at 1092.

As a result, the Court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion sex, or national origin?" *Brady*, 520 F.3d at 494 (citations omitted). In other words, the Court must evaluate whether Wilson "produced evidence sufficient for a reasonable jury to find that the [government's] stated reason was not the actual reason and that [it] intentionally discriminated against [her]." *Id.* at 495.

As an initial matter, the Court grants the government's motion as to Wilson's sex and age discrimination claims.[3] Although Wilson has the burden of presenting affirmative evidence to

---

[3] Wilson attempts to bring an age-discrimination claim under Title VII, *see e.g.*, Compl. ¶¶ 120–26 ("Count 3: Promotion Discrimination on the Basis of Age in Violation of 42 U.S.C. § 2000e"); however, an age-discrimination claim is properly brought under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. Despite this error, the government did not challenge Wilson's pleading. The D.C. Circuit has held that

9

defeat the government's Motion, Wilson has offered no evidence or argument whatsoever in support of either of these claims.[4]  Indeed, at oral argument her counsel could not point to any facts or arguments to support them.

As to her race-discrimination claim, Wilson presents four arguments for why the government's selection of Taylor was pretextual.  Whether taken individually (as Wilson presents them) or collectively, Wilson has not presented sufficient evidence from which a reasonably jury could find that the government's asserted reason for not selecting Wilson—the selection of a more qualified candidate—was the actual reason.

### A. The Job Announcement's Selection Criteria

Wilson contends that the government deviated from DHS's standard selection procedures, giving rise to an inference of pretext.  Pl.'s Mot. at 4–5 (citations omitted).  She argues that Bobich and Morgan-Lowden (1) ignored the job announcement, which "clearly sought someone to 'oversee the Department's Bankcard Programs'"; (2) manipulated the selection process to build their case for promoting Taylor; (3) drafted the interview outline to avoid questions about candidates' management experience or experience overseeing government charge card programs; and (4) used Taylor's formal education as a factor in his selection.  *Id.*

---

plaintiff "can make use of the *McDonnell Douglas* evidentiary framework to establish that age was the but-for cause of the challenged personnel action." *Ford v. Mabus*, 629 F.3d 198, 207 (D.C. Cir. 2010).  As a result, because DHS did not challenge the pleading and because the analysis mirrors Wilson's Title VII claims, the Court construes Wilson's age claim as being brought under the ADEA.

[4] To be clear, the Court is not granting the government's Motion on these claims because it is conceded by Wilson. *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 508 (D.C. Cir. 2016) ("[U]nder the current version of Rule 56 a motion for summary judgment cannot be deemed 'conceded' for want of opposition.").  Instead, the Court grants the government's Motion because Wilson has failed to meet her evidentiary burden in opposing the Motion. *See Anderson*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

at 5–7. In other words, Wilson argues that these irregularities in the selection process create an inference of pretext. The Court disagrees.

A "violation of hiring protocol is not, by itself, sufficient to justify an inference of discriminatory intent." *Mulrain v. Donovan*, 900 F. Supp. 2d 62, 72 (D.D.C. 2012). Instead, a violation of hiring protocol "'may' be probative of the employer's 'true motivation' if (1) the violation is suspicious, in and of itself, (2) the agency 'inexplicably departed' from its normal procedures, or (3) the violation inherently raises credibility questions." *Id.* (citing *Perry v. Shinseki*, 783 F. Supp. 2d 125, 138–39 (D.D.C. 2011)).

Wilson attempts to read mandatory language into the job announcement to manufacture a departure from the normal DHS hiring procedure. She argues that the job announcement *required* DHS to hire someone with experience overseeing government charge card programs and supervising and guiding staff responsive for those programs. *See* Pl.'s Mot. at 5.

But the job announcement cannot bear this reading. The posting required certain "specialized experience," which it defined as "serving as a financial management technical expert, utilizing a professional knowledge of financial management and/or internal control principles and procedures to advise internal and external stakeholders and customers on best practices, policies and procedures and systems requirements." Job Announcement at 2. The posting also included *examples* of potential "specialized experience," stating that "[s]uch experience *may* include," *see id.* (emphasis added), the government-charge-card experience Wilson emphasizes. Nothing in the job announcement required government-charge-card experience and nothing in the job announcement limited the government to the listed examples. The plain language of the job announcement thus contradicts Wilson's reading of it. *See Lash*, 786 F.3d at 6 ("When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quoting *Scott*, 550 U.S. at 380)). And Taylor's "specialized experience" that the promotion panel ultimately relied on was consistent with the job announcement. *Compare* Job Announcement at 2 (requiring "a professional knowledge of financial management and/or internal control principles and procedures to advise internal and external stakeholders and customers on best practices, policies and procedures and systems requirements"), *with* Bobich Memo at 1–2 (focusing on "(1) [a]bility to lead projects and people, (2) technical subject matter expertise, and (3) ability to lead change from a department-wide perspective, working with external customers and stakeholders outside the immediate span of control" when selecting a candidate).

Wilson also asserts that the government's use of Taylor's education as a factor in his selection violated the job announcement and DHS's hiring procedure, but she does not explain how this is so. *See* Pl.'s Mot. at 6–7. After all, the job announcement stated merely that "[s]ubstitution of education *in lieu of* specialized experience may not be used for this grade level," Job Announcement at 2 (emphasis added), and the selection memo noted that Taylor's education simply "enhanced his application" (a fact that Wilson again does not contest with actual record evidence). Def.'s Mot. & Opp'n at 12–13; *see also* Bobich Memo at 2.

Wilson's remaining arguments on this score are compilations of conclusory allegations, sparsely supported by facts in the record (if at all). For instance, Wilson argues that Bobich and Morgan-Lowden "extracted" from Taylor's résumé the job responsibilities they used to then hire him. Pl.'s Mot. at 6. In support of this argument, Wilson points to various documents and portions of depositions that focus on the panel's reasoning behind selecting Taylor and explanation for why his qualifications met the definition of "specialized experience" as used in

12

the job announcement. *See* Pl.'s Mot. at 6 (citing Pl.'s SoF ¶¶ 51–56). But she fails to provide even a scintilla of evidence to support her claim that Bobich and Morgan-Lowden "extracted" job responsibilities from Taylor's résumé for the purpose of justifying his selection.

Wilson contends that the interview outline was improperly drafted because it failed to include questions about government-charge-card programs or management experience. *Id.* She does not, however, cite to any evidence requiring a question about government charge card programs in the outline, *see generally id.*, and does not respond to the government's argument that the outline in fact contained a question that would allow candidates to discuss their managerial experience, *see* Def.'s Mot. & Opp'n at 12.

Wilson also claims that the decision not to include Burris in creating the interview outline and the second round of interviews was improper because Burris was the only panel member of a racial minority. Pl.'s Mot. at 6, 10–11. But Wilson again fails to cite any fact creating a dispute over whether Burris's lack of participation was contrary to DHS policy. Wilson also does not respond to the government's argument that Burris (unlike Bobich and Morgan-Lowden) would not have been a supervisor of the person selected, and thus that it was "reasonable for the interviews to be conducted by the Director and Deputy Director of the Financial Management Division" once the government was in the final round of interviews. Def.'s Mot. & Opp'n at 12.

In sum, Wilson has not met her burden to establish that the government deviated from DHS's standard selection procedures and therefore cannot establish an inference of pretext on this ground.[5]

---

[5] Wilson also contends that the promotion panel "failed to follow standard and proper OPM and DHS promotion selection procedures when it failed to make and retain records or notes of the personal interviews of each candidate." Pl.'s Mot. at 13 (citing 5 C.F.R. § 335.103(b)(5) (2018)). The regulation Wilson cites, however, does not require that DHS make or keep interview notes; instead, it requires that "[e]ach agency must maintain a temporary record of

13

### B. Wilson's Qualifications as Compared to Taylor's

Wilson next argues that her "job qualifications were demonstrably superior to those of the selectee, Robert Taylor," Pl.'s Mot. at 9, thus establishing an inference of pretext. "[W]hen an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly better qualified* for the job' than those ultimately chosen." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (emphasis added) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)). "In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Aka*, 156 F.3d at 1294. As a result, the "qualifications gap must be great enough to be inherently indicative of discrimination." *Adeyemi*, 525 F.3d at 1227 (internal quotation marks omitted) (citation omitted). Wilson has failed to show that such a gap exists here.

Wilson argues that, based on the job announcement, her "job qualifications were demonstrably superior" to Taylor's. Pl.'s Mot. at 9–10. And Wilson relies on an affidavit from Thomas F. Boyd, her former supervisor in the Bankcard and Policy Branch of the Office of the Chief Financial Officer and the previous holder of the GS-15 position, which states he was "surprised when [he] learned" that Taylor was selected for the position. *Id.* at 10; Pl.'s Reply at 4; Boyd Decl. ¶ 28, ECF No. 14-5.

---

each promotion *sufficient to allow reconstruction of the promotion action*, including documentation on how candidates were rated and ranked." 5 C.F.R. § 335.103(b)(5) (emphasis added). Wilson does not explain why interview notes are needed "to allow reconstruction of the promotion action" and does not explain why the records produced by the government fail to meet this standard.

The government, for its part, argues that it found Taylor much more qualified for the position than Wilson. Def.'s Mot. & Opp'n at 15–18. The government also points to Taylor's and Wilson's certifications, emphasizing that Taylor's certifications were "far more relevant to the DHS bank card programs, especially considering the emphasis placed on internal controls and the inherent fraud risks associated with charge card use." Bobich EEO Decl. at 4. By comparison, Wilson does not have a fraud certification. *See* Def.'s Mot. & Opp'n at 15–16; Bobich EEO Decl. at 4; Wilson Résumé at 5. The government argues that it selected Taylor because Bobich recognized Taylor's "ability to lead complex financial policy initiatives," lead investigations, and develop department-wide methodologies. Bobich EEO Decl. at 4; Bobich Memo at 2. The government notes that Taylor has two college degrees, making his "academic credentials . . . superior to" Wilson's. Bobich EEO Decl. at 4; Bobich Memo at 2. And the government notes that even Boyd—who "retired before the position was advertised and did not know the requirements for the position or even who had applied," Def.'s Reply at 2—does not state that Wilson was significantly better qualified than Taylor for the GS-15 position. *Id.*

Wilson does not contradict any of this evidence, leaving it unrebutted for purposes of summary judgment. *See Celotex*, 477 U.S. at 324 ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." (internal quotation marks omitted)). Wilson can establish that she was *qualified* for the position—a point the government agrees with, *see, e.g.*, Def.'s SoF ¶ 4 ("[Wilson] was one of the 38 who were deemed qualified for the [GS-15 position]."). But she has not demonstrated that she was "*significantly better qualified* for the job," *Adeyemi*, 525 F.3d at 1227 (emphasis added) (quotation omitted), such that a pretext can be inferred. After all, "Title VII

. . . does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (citation omitted). And the Court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation omitted). Whether or not Taylor would have been the Court's (or the jury's) top choice, based on the summary judgment record, Wilson cannot establish that she was significantly better qualified for the job than Taylor.

### C. The Government's Reasons for Promoting Taylor Were Credible

Wilson also contends that the government's articulated reasons for promoting Taylor lack credence. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. But the evidence is either lacking or unpersuasive here.

Bobich outlined the reasons for selecting Taylor in his selection memorandum. *See generally* Bobich Memo. That memorandum states,

> In interviewing candidates and making a selection, the [promotion] panel focused on three primary qualifications: (1) Ability to lead projects and people, (2) technical subject matter expertise, and (3) ability to lead change from a department-wide perspective, working with external customers and stakeholders outside the immediate span of control. During our interview process, Mr. Taylor demonstrated all of these qualifications, and did so in a more convincing manner than the other interviewees.

*Id.* at 1–2. The memorandum went on to expand on these qualifications and concluded that, "[b]ased on his experience, education, and responses to our questions during two interviews, Mr. Taylor is the best candidate for the position of Assistant Director, Bankcard and Review." *Id.* at 2.

Much of Wilson's challenge to these justifications is a rehash of her other arguments.[6] In her only new argument, Wilson challenges the credibility of the government's assertion that the "position had 'evolved' between 2012 and 2014." Pl.'s Mot. at 7. Wilson again argues that the job announcement required specific government-charge-card experience and that the government failed to follow that requirement. *See id.* at 7–8. But her reading of what the job announcement "requires" is contrary to the job announcement's plain language. *See supra* pp. 11–12. Wilson also argues that Bobich never specified how the position had "evolved" or how her "management experience was outdated given that she had worked on major DHS projects department-wide during her entire tenure as Bankcard Program manager." Pl.'s Mot. at 8. But Bobich explained that

> [a]lthough Ms. Wilson's skills and experience may have been a fit for this position at one time, the role has evolved in recent years to focus more on department-wide policy and oversight of the bankcard programs, rather than mission service delivery. The time gap between Ms. Wilson's tenure in DHS OCFO/Financial Management and the vacancy announcement resulted in a lack of contemporary experience with the business of the program.

Bobich EEO Decl. at 6. Morgan-Lowden "reached a similar conclusion." Def.'s Mot. & Opp'n at 14 (citing Morgan-Lowden EEO Decl. at 7, ECF No. 16-3 at 45).

Wilson's only response is that she "has shown that her work experience was a perfect match for the job announcement," and that Boyd had said that Wilson was qualified for the job. Pl.'s Reply at 13. The problem with these arguments, however, is that they are not directly

---

[6] *See* Pl.'s Mot. at 7–8 (arguing that her qualifications were superior to Taylor's; that the job responsibilities that Bobich and Morgan-Lowden used to promote Taylor "had little or no relationship to the . . . job requirement and should have never been used to justify the promotion"; and that Bobich and Morgan-Lowden used Taylor's formal education to justify his promotion (citation omitted)).

responsive to—and do not provide any basis to contest—the government's statement that the job requirements had in fact evolved. As a result, Wilson cannot establish pretext on this ground.

### D. Alleged Discrimination Against Burris and Howard

Finally, Wilson argues that Bobich and Morgan-Lowden discriminated against both Burris, the third member of the promotion panel, and Howard, the African American runner-up for the GS-15 position, and that this discrimination was indicative of treatment of individuals of the same race as Wilson. In particular, Wilson argues that the government's treatment of Burris, the only African American on the promotion panel, was "shameful." Pl.'s Reply at 8. Wilson claims that, despite being "selected to serve on the promotion panel, [Burris] was excluded from virtually every aspect of its decision-making, by her two white supervisors." *Id.* And in her deposition, Wilson stated that she believed that Bobich and Morgan-Lowden excluded Burris from the second round of interviews because "perhaps [Burris] didn't deem [Taylor] to go to the next stage," Wilson Depo. at 53:17–18—a theory based on Wilson's belief that Burris "saw [Taylor's] resume and she saw the announcement and she—it was clear that he was not qualified," *id.* at 53:22–24.

To be sure, a "plaintiff may support an inference that her employer's stated reasons for undertaking the adverse employment action in question were pretextual by citing . . . [']the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff.'" *Wheeler*, 812 F.3d at 1115 (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C.

Cir. 2015)). But Wilson's arguments regarding Burris lack evidentiary support.[7] Pl.'s Mot. at 10–11.[8]

While it is the case that Burris did not participate in certain interviews, Wilson points to no evidence supporting her contention that Bobich and Morgan-Lowden systematically excluded Burris from key stages of the interview process. Wilson also does not point to any DHS policy that required Burris to participate in every aspect of the selection process. And the rest of Wilson's claims are supported by nothing than her own speculation. *See Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993) ("[A] mere unsubstantiated allegation . . . creates no 'genuine issue of fact' and will not withstand summary judgment." (citation omitted)).

Wilson similarly argues that *Howard* "should have been given the opportunity to have . . . Burris present during his interview with the selection panel." Pl.'s Mot. at 11. In her view, "[w]ithout . . . Burris's presence, there were no minority persons on the selection panel which likely played a role in . . . Howard being bypassed for the [GS-15 position]." *Id.* (citations omitted).

---

[7] It does not appear that Wilson deposed Burris for this litigation; rather, Wilson relies on Burris's statements from her EEO Declaration. *See e.g.*, Pl.'s Reply at 7–10. *See generally* Burris EEO Decl., ECF No. 17-4.

[8] Bobich, the government notes, claims not to have been aware of Wilson's race during the selection process, Def.'s SoF ¶ 34—a point that Wilson challenges, Wilson Depo. at 49:13–14 (claiming to have "met with [Bobich] on a couple occasions to discuss his travel and fleet car program"). But Wilson was "not quite sure if he quite remembered [her]." *Id.* at 49:14–15.

The government also emphasizes Bobich's record prior to the decision at issue here, which included selecting one African American male and two African American females for GS-14 positions. Def.'s Mem. at 22 (citing Bobich EEO Decl. at 8). Wilson responds by contending it was Burris, not Bobich, who hired two of those individuals. Pl.'s Reply at 15 (citing Burris EEO Decl. at 6).

Again, Wilson's argument is based on speculation, not actual evidence. Wilson provides no evidence showing that the government was obligated to include Burris at all phases of the selection process or that Howard was owed the opportunity to have her there. A "speculative assessment" for an employer's adverse action "cannot be used to create a genuine issue of material fact for summary judgment." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 99 (D.D.C. 2005) (citing *Anderson*, 477 U.S. at 252).

## IV. Conclusion

Because no reasonable juror could find, based on the present record, that Wilson suffered discrimination on the basis of her race, sex, or age, the government is entitled to summary judgment on all claims. The government's Motion for Summary Judgment is therefore **GRANTED** and Wilson's Cross-Motion is **DENIED**. An order consistent with this Memorandum Opinion will be issued contemporaneously.

DATE: February 7, 2020

CARL J. NICHOLS
United States District Judge